

FILED
10/16/2025 MMA
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 24 CR 508-1 |
| v. | |
| EDERGIL FIGUEROA | Judge Matthew F. Kennelly |

## PLEA AGREEMENT

1.      This Plea Agreement between the United States Attorney for the Northern District of Illinois, ANDREW S. BOUTROS, and defendant EDERGIL FIGUEROA, and his attorneys, JAMES DIQUATTRO and PHILLIP HADDAD, is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2.      The indictment in this case charges defendant with three counts of distributing a controlled substance, namely, a quantity of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) (Counts 1–3); and one count of possession with intent to distribute a controlled substance, namely, a quantity of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) (Count 4).

3.      Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.      Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.      By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count 3 of the indictment, which charges defendant with knowingly and intentionally distributing a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

## Factual Basis

6.      Defendant will plead guilty because he is in fact guilty of the charge contained in Count 3 of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt and constitute relevant conduct pursuant to Guideline § 1B1.3:

On or about January 17, 2022, at Chicago Ridge, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant EDERGIL FIGUEROA, did knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

Specifically, on or about January 12, 2022, FIGUEROA met with two individuals who, unbeknownst to FIGUEROA, were undercover law enforcement officers ("FBI UC1" and "DEA UC2"), at a restaurant in Villa Park, Illinois. During

2

this meeting, Figueroa agreed to sell FBI UC1 one kilogram of cocaine in exchange for $32,000.

On January 17, 2022, FIGUEROA met DEA UC2 and an individual who, unbeknownst to FIGUEROA, was an undercover law enforcement officer ("DEA UC1") in Chicago Ridge. Also present at this meeting was an individual who, unbeknownst to FIGUEROA, was a law enforcement confidential source (CS). During this meeting, FIGUEROA gave DEA UC1 and DEA UC2 a manilla envelop, which FIGUEROA knew contained approximately 1 kilogram of cocaine, in exchange for $32,000. After receiving the package, DEA UC2 opened it and removed an item wrapped in plastic. DEA UC2 then proceeded to cut into the plastic item in front of FIGUEROA. DEA UC2 then indicated that the substance inside the plastic looked good. FIGUEROA provided the CS with $500 from the $32,000 FIGUEROA received from the UCs as the CS's "cut" of the transaction. FIGUEROA knowingly and intentionally distributed to DEA UC1 and DEA UC2 a package containing approximately 999.6 grams of cocaine in exchange for $32,000.

Prior to this transaction, on or about January 21, 2021, the CS and FIGUEROA exchanged phone calls during which FIGUEROA agreed to sell the CS two ounces of cocaine in exchange for $1,500 per ounce. The following day, on January 22, 2021, FIGUEROA met the CS in Chicago Ridge. Later, Individual A arrived at the meeting location and, at FIGUEROA's direction, provided the CS with a bag that FIGUEROA knew contained cocaine. The CS provided Individual A with $3,000 of law

3

enforcement funds. During this meeting, FIGUEROA knowingly and intentionally distributed to the CS, through Individual A, a bag containing approximately 54.8 grams of cocaine.

On May 4, 2021, FIGUEROA, DEA UC1, and the CS met in Markham, Illinois. During this meeting, FIGUEROA and the CS discussed FIGUEROA obtaining 500 grams of cocaine for the CS. On June 9, 2021, again in Markham, Illinois, the CS met FIGUEROA and an individual who FIGUEROA arranged to supply cocaine to the CS ("Individual B"). During this meeting, at FIGUEROA's direction, Individual B offered to sell the CS 500 grams of cocaine in exchange for $22,000. The CS agreed to this offer.

On June 11, 2021, in Chicago Ridge, the CS met with FIGUEROA and FIGUEROA's co-defendant in case number 24 CR 508, Alberto Ramos, who Individual B had directed to deliver cocaine to the CS and FIGUEROA. During this meeting, Ramos provided FIGUEROA and the CS with a bag that FIGUEROA knew contained cocaine. Ramos indicated that there must have been a miscommunication with Individual B regarding the amount of cocaine and retrieved the bag he had given to FIGUEROA and the CS. Ramos, FIGUEROA, and the CS agreed to meet later that week so Ramos could sell the CS a greater quantity of cocaine.

On June 17, 2021, the CS met with FIGUEROA, Ramos, and Individual B in Chicago Ridge. Prior to FIGUEROA's arrival, Ramos provided the CS with a package, and the CS provided Ramos with $22,000 of law enforcement funds. While Ramos

4

and the CS were counting the money, FIGUEROA arrived. FIGUEROA stated that he "had not seen such white ones in a while." FIGUEROA then took a sample of the cocaine. Individual B also took a sample of the cocaine. During this meeting, FIGUEROA, together with Ramos and Individual B, knowingly and intentionally distributed to the CS a package containing approximately 495.4 grams of cocaine in exchange for $22,000 from the CS.

Following the January 17, 2022, transaction discussed above, on March 11, 2022, in Dixon, Illinois, FIGUEROA met with DEA UC2. DEA UC2 asked FIGUEROA if she could purchase five kilograms of cocaine from FIGUEROA. FIGUEROA responded that five kilograms of cocaine was too much because he could get a "kingpin charge" carrying a sentence of twenty years. Instead, FIGUEROA agreed to sell DEA UC2 three kilograms of cocaine on March 16, 2022, and an additional two kilograms of cocaine on March 18, 2022. On March 13, 2022, during recorded calls, FIGUEROA, using coded language, told the CS that FIGUEROA had two kilograms of cocaine ready to deliver to DEA UC2 on March 16, 2022.

On March 16, 2022, in Cicero, Illinois, law enforcement stopped FIGUEROA in his vehicle and retrieved from the spare tire compartment two packages containing what FIGUEROA knew to be cocaine and which he had planned to distribute to DEA UC2 later that day. Prior to its recovery by law enforcement, FIGUEROA knowingly and intentionally possessed with intent to distribute two packages containing approximately 2,004.5 grams of cocaine.

7.      Defendant, for purposes of computing his sentence under Guidelines §§ 1B1.2 and 1B1.3, stipulates to having committed the following additional offense, and agrees to the relevant conduct set forth below:

On or about November 27, 2019, in the Norther District of Illinois, Eastern Division, and elsewhere, defendant EDERGIL FIGUEROA and Oleksandr Furkal, with intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, did knowingly conduct a financial transaction affecting interstate commerce, namely, the deposit of a Fifth Third Bank Cashier's Check, with check number 32355538 in the amount of $9,500 into the Undercover Bank Account ending -7663, involving property represented by a law enforcement officer to be proceeds of specified unlawful activity, that is, the felonious buying, selling, and otherwise dealing in a controlled substance, in violation of Title 18, United States Code, Sections 1956(a)(3)(B).

More specifically, on or about November 27, 2019, FIGUEROA met with FBI UC1 and the CS in Chicago Ridge for the purpose of discussing a transaction to launder the proceeds of narcotics sales. During the meeting, FBI UC1 provided FIGUEROA $50,000, which FBI UC1 told FIGUEROA were the proceeds of cocaine transactions. FIGUEROA agreed to launder the proceeds with Furkal in exchange for a 16% fee. FIGUEROA told FBI UC1 that FIGUEROA would launder the proceeds through businesses owned by Furkal.

6

Between November 27, 2019, and December 3, 2019, FIGUEROA and Furkal conducted multiple transactions wherein they deposited a total of $42,000 into what unbeknownst to FIGUEROA and Furkal was a law enforcement-controlled account, including $9,500 on November 27, 2019, which FIGUEROA deposited into the Undercover Bank Account ending in -7663 through a Fifth Third Bank Cashier's Check with check number 32355538. FIGUEROA and Furkal kept the remaining $8,000 as their fee.

On or about February 7, 2020, FIGUEROA and FBI UC1 met in Chicago Ridge for the purpose of discussing a transaction to launder the proceeds of narcotics sales. FIGUEROA told FBI UC1 how he and Furkal previously laundered the money from the November 27, 2019 meeting, and FIGUEROA further described methods they could use in the future. At the meeting, FBI UC1 provided Figueroa $100,000 in purported narcotics proceeds. FIGUEROA agreed to lauder the $100,000 in exchange for a 14% fee.

Between February 7, 2020, and February 25, 2020, FIGUEROA and Furkal conducted multiple transactions wherein they deposited a total of $82,000 into a law enforcement-controlled account. FIGUEROA and Furkal kept $17,000 as their fee.

On or about March 4, 2020, FIGUEROA and Furkal met FBI UC1 in Chicago, Illinois. During the meeting, FBI UC1 told FIGUEROA and Furkal he was trying to move the proceeds of cocaine transactions, and the three agreed to meet the following week. On or about March 10, 2020, FIGUEROA, Furkal, FBI UC1, and another

7

individual who, unbeknownst to FIGUEROA and Furkal, was an undercover law enforcement officer ("FBI UC2"), met in Chicago Ridge for the purpose of discussing a transaction to launder the proceeds of narcotics sales. During the meeting, FBI UC1 provided FIGUEROA and Furkal $50,000 in purported narcotics proceeds, which FIGUEROA and Furkal agreed to launder in exchange for a 14% fee.

Between March 11, 2020, and April 9, 2020, FIGUEROA and Furkal conducted multiple transactions wherein they deposited a total of $43,000 into two law enforcement-controlled accounts. FIGUEROA and Furkal kept $7,000 as their fee.

On or about April 20, 2020, the CS and FIGUEROA met in Chicago Ridge for the purpose of discussing a transaction to launder the proceeds of narcotics sales. The CS provided FIGUEROA with $120,000 in purported narcotics proceeds. The CS later called FBI UC1 and put him on speaker phone with FIGUEROA. During this call, FBI UC1 confirmed that FIGUEROA agreed to launder the funds in exchange for a 14% fee.

Between April 21, 2020, and May 4, 2020, FIGUEROA and Furkal conducted multiple transactions wherein they deposited a total of $100,800 into two law enforcement-controlled accounts. FIGUEROA and Furkal kept $17,200 as their fee.

On or about July 17, 2020, the CS and FIGUEROA met in Chicago Ridge for the purpose of discussing a transaction to launder the proceeds of narcotics sales. During the meeting, the CS and FIGUEROA called FBI UC1, who instructed FIGUEROA to launder the money to accounts which, unbeknownst to FIGUEROA,

8

were law enforcement-controlled accounts. The CS provided FIGUEROA with $70,000 in purported narcotics proceeds.

Between July 20, 2020, and July 31, 2020, FIGUEROA and Furkal conducted multiple transactions wherein they deposited a total of $58,770 into two law enforcement-controlled accounts. FIGUEROA and Furkal kept $9,630 as their fee.

On or about October 15, 2020, the CS and FIGUEROA met in Chicago Ridge and the CS provided FIGUEROA with $100,000 in purported narcotics proceeds to launder. After the delivery, FBI UC1 sent text messages to FIGUEROA and Furkal wherein they discussed the transaction and the money.

Between October 19, 2020, and November 10, 2020, FIGUEROA and Furkal conducted multiple transactions wherein they deposited a total of $82,000.20 into two law enforcement-controlled accounts. FIGUEROA and Furkal kept $13,999.80 as their fee.

In or around April 2021, FBI UC1 contacted FIGUEROA and in a series of text messages discussed laundering additional funds. FIGUEROA directed FBI UC1 to communicate directly with Furkal. FIGUEROA acknowledges that FBI UC1 then engaged in a series of recorded calls with Furkal in which they discussed laundering additional funds.

FIGUEROA acknowledges that on or about April 22, 2021, the CS, on behalf of FBI UC1, met Furkal in Chicago Ridge. During this meeting, the CS provided Furkal with $120,000 in purported narcotics proceeds. Between May 7, 2021, and

9

June 28, 2021, FIGUEROA and Furkal conducted multiple transactions wherein they deposited a total of $108,000.50 into two law enforcement-controlled accounts. FIGUEROA and Furkal kept $10,799.50 as their fee.

On or about September 3, 2021, FIGUEROA, met with the CS, and two individuals who, unbeknownst to FIGUEROA, were undercover law enforcement officers (DEA UC2 and DEA UC3) in Dixon, Illinois. During this meeting, DEA UC2 and DEA UC3 provided FIGUEROA with a bag containing $100,000 in purported narcotics proceeds to launder. Between October 7, 2021, and January 20, 2022, FIGUEROA and Furkal conducted multiple transactions wherein they deposited a total of $84,500 into two law enforcement-controlled accounts. FIGUEROA and Furkal kept $13,500 as their fee.

FIGUEROA acknowledges that he was in the business of laundering the proceeds of narcotics sales and that he and Furkal engaged the above transactions with individuals who unbeknownst to FIGUEROA were law enforcement agents, and with the CS, with the intent to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of specified unlawful activity.

## Maximum Statutory Penalties

8. Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

10

a. A maximum sentence of 20 years' imprisonment. This offense also carries a maximum fine of $1,000,000. Defendant further understands that the judge also must impose a term of supervised release of at least three years, and up to any number of years, including life.

b. Pursuant to Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty imposed.

### Sentencing Guidelines Calculations

9. Defendant understands that, in determining a sentence, the Court is obligated to calculate the applicable Sentencing Guidelines range, and to consider that range, possible departures under the Sentencing Guidelines, and other sentencing factors under 18 U.S.C. § 3553(a), which include: (i) the nature and circumstances of the offense and the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (iii) the kinds of sentences available; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to any victim of the offense.

11

10.    For purposes of calculating the Sentencing Guidelines, the government's position as of the date of this Agreement is as follows:

a.    **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the 2024 Guidelines Manual.

b.    **Offense Level Calculations**.

*Count Three*

i.    The base offense level is 28, pursuant to Guideline § 2D1.1(a)(5) and (c)(6) because the total quantity of cocaine involved in the offense of conviction and relevant conduct for which defendant is accountable is at least 3.55 kilograms, which is greater than 3.5 kilograms but less than 5 kilograms.

ii.    Based on the evidence now known to the government, the parties agree, subject to the Court's approval, that Guideline § 5C1.2 and Title 18, United States Code, Section 3553(f) are applicable, and that the Court shall impose a sentence without regard to any statutory minimum sentence, and the offense level shall be reduced by two levels, pursuant to Guideline § 2D1.1(b)(18).

*Stipulated Offense*

iii.    The base offense level for the money laundering conduct is 22, pursuant to Guideline § 2S1.1(a)(2), because the amount of property involved in

12

the stipulated offense and relevant conduct for which defendant is accountable was $601,070.50, which is greater than $550,000, but less than $1,500,000.

iv.        Pursuant to Guideline § 2S1.1(b)(1), the offense level is further increased by 6 levels, because defendant knew or believed that any of the laundered funds were the proceeds of an offense involving the manufacture, importation, or distribution of a controlled substance.

v.        Pursuant to Guideline § 2S1.1(b)(2)(C), the offense level is further increased by 4 levels because Guideline § 2S1.1(a)(2) applies, and defendant was in the business of laundering funds.

vi.        The total offense level for the money laundering conduct is 32.

### *Grouping*

vii.        The count of conviction and stipulated offense each constitute a separate group pursuant to Guideline § 3D1.2.

viii.        Pursuant to Guideline § 3D1.4, defendant receives 1 unit for the stipulated offense. Pursuant to Guideline § 3D1.4(a), because the count of conviction has an offense level that is 5 to 8 levels less serious, that offense conduct counts as one half unit. Because there are 1.5 units, 1 level is added to the group with the highest offense level, resulting in a combined offense level of 33.

ix.        The government understands that defendant will truthfully admit the conduct comprising the offenses of conviction, and truthfully

13

admit or not falsely deny any additional relevant conduct for which the defendant is accountable under Guideline § 1B1.3. Therefore, based upon facts now known to the government, defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

x.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

c.     **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal 1 and defendant's criminal history category is I:

14

i. On or about May 28, 2014, defendant was convicted in the Circuit Court of Cook County, Illinois of driving under the influence of alcohol and sentenced to 18 months' supervision. Pursuant to Guideline § 4A1.1(c), defendant receives 1 criminal history point for this conviction.

d. **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the government anticipates the offense level to be 30 which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 97 to 121 months' imprisonment, in addition to any supervised release and fine the Court may impose.

e. Defendant and his attorneys and the government acknowledge that the guidelines calculations set forth in this Agreement are preliminary in nature and are non-binding predictions upon which neither party is entitled to rely. Defendant understands the above calculations are based on information now known to the government and that further review of the facts or applicable legal principles may lead the government to change its position on the Guidelines calculations. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the defendant's, the probation officer's, or the Court's concurrence with the above calculations, and

15

defendant shall not have a right to withdraw his plea on the basis of a change in the government's position on the guideline calculations or the Court's rejection of these calculations.

11.     Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by the government prior to sentencing. The government may correct these errors by a statement to the Probation Office or the Court, setting forth any changes in the government's position regarding the guidelines calculations. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea on the basis of such corrections.

### Agreements Relating to Sentencing

12.     Each party is free to recommend whatever sentence it deems appropriate.

13.     It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

14.     The parties further agree, pursuant to Title 18, United States Code, Section 3583(d), that the sentence to be imposed by the Court shall include, as a

16

condition of any term of supervised release or probation imposed in this case, a requirement that defendant repay the United States $97,102.30 as compensation for government funds that defendant received during the investigation of the case, less any amounts repaid by Figueroa's co-defendant in case number 24 CR 509, Oleksandr Furkal, and $31,500 as compensation for the government funds that defendant received during the investigation of case number 24 CR 508.

15.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

16.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), and Title 31, United States Code, Sections 3711, 3716, and 3728, notwithstanding any payment schedule set by the Court.

17.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment as to defendant, as well as the indictment as to defendant in case number 24 CR 509-1.

17

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

18.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 24 CR 508-1 and 24 CR 509-1.

19.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

20.     Defendant understands that, by pleading guilty, he surrenders certain rights, including the following:

a.     **Trial rights.** Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i.     The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge

18

sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii.     If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii.     If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant.

19

Defendant would be able to confront those government witnesses, and his attorney would be able to cross-examine them.

      vi.    At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

      vii.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

      b.    **Appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

21.    Defendant understands that, by pleading guilty, he is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorneys have explained those rights to him, and the consequences of his waiver of those rights.

20

**Presentence Investigation Report/Post-Sentence Supervision**

22. Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall endeavor to ensure that the relevant facts and sentencing factors, as applied to the facts, are brought to the District Court's attention fully and accurately, including facts related to the defendant's criminal conduct and related conduct, and any relevant information concerning the defendant's background, character, and conduct that the District Court may consider under 18 U.S.C. § 3661 in imposing a sentence.

23. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

24. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release or probation to which

21

defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

25.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any ordered fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

26.     Defendant understands that, if convicted, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

### Conclusion

27.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

28.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any

22

term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

29.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

30.     Defendant and his attorneys acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

31.     Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he

23

understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: 10/16/25

ANDREW ERSKINE
Digitally signed by ANDREW ERSKINE
Date: 2025.10.09 08:57:27 -05'00'

Signed by Andrew C. Erskine on behalf of
ANDREW S. BOUTROS
United States Attorney

ANNE YONOVER
Digitally signed by ANNE YONOVER
Date: 2025.10.09 09.24.22 -05'00'

ANNE L. YONOVER
Assistant U.S. Attorney

EDERGIL FIGUEROA
Defendant

JAMES DIQUATTRO and PHILLIP HADDAD
Attorneys for Defendant

24